UNITED STATES *v.* PACIFIC COAST FEATHER COMPANY (GEO. S. BUSH & CO., INC.) (No. 4730)[1]

United States Court of Customs and Patent Appeals, February 6, 1953

*Charles J. Wagner,* Acting Assistant Attorney General (*Daniel I. Auster, Dorothy C. Bennett,* and *Alfred A. Taylor, Jr.,* special attorneys, of counsel), for the United States.

*Lawrence, Tuttle & Harper* (*George R. Tuttle* of counsel) for appellee.

[Oral argument December 9, 1952, by Mr. Auster and Mr. Tuttle]

Before GARRETT, Chief Judge, and WORLEY, and JACKSON (retired), Associate Judges

JACKSON, Judge, delivered the opinion of the court:

The Government has appealed from a judgment of the United States Customs Court, Third Division, pursuant to its decision, Abstract 56194, granting the petition of appellee for a remission of additional duties filed under section 489 of the Tariff Act of 1930. Additional duties had been assessed because of an undervaluation of an importation of duck and goose feathers from Shanghai, China, which was entered at the port of Seattle, Washington.

Entry of the imported merchandise was made April 7, 1949, at a valuation of 31 cents per pound for duck feathers and 48 cents per pound for goose feathers. The goods were appraised at the values of 42 cents per pound for duck feathers and 61 cents per pound for goose feathers.

The entered values corresponded to those appearing on a commercial invoice and prior to entry, Geo. S. Bush & Co., Inc., broker for appellee, showed that invoice to the examiner of customs together with a "submission sheet." The sheet requests information from the appraiser prior to entry with respect to the value of the merchandise to

---

[1] C. A. D. 510.

be entered. It appears that the customs officials reported they had no current information concerning such merchandise. Appellee produced four witnesses on its behalf and one witness appeared for the Government. Several exhibits were also introduced in evidence.

The duck and goose feathers were exported by Liebermann, Waelchli & Co. of Shanghai. Prior to the order of the involved merchandise, appellee had in its possession a price list of the exporter and after exchanges of cablegrams, it was agreed that the prices to be paid for the feathers were 42 cents per pound for the duck feathers and 61 cents per pound for the goose feathers.

On February 3, 1949, appellee sent a cablegram to the shipper for a trial order of both types of feathers at 40 cents and 60 cents per pound, respectively. The exporter counter-offered to sell at 42 cents and 63 cents per pound, respectively. Under date of February 8, 1949, appellee sent a cablegram to the shipper offering to pay 40 cents per pound for the duck feathers and 60 cents per pound for the goose feathers. A cablegram of February 9, 1949, from the shipper to appellee was received in which the best prices quoted were 42 cents and 61 cents per pound, respectively. Under date of February 10, 1949, appellee sent a cablegram to the shipper agreeing to pay 42 cents and 61 cents per pound, respectively, for the feathers and requesting an early shipment thereof. Under date of February 13, 1949, appellee cabled the shipper requesting an increase in the size of the order and requesting shipping date advice. The shipper notified appellee that five extra bales would be shipped at the price of 63 cents per pound and requested appellee for confirmation. Appellee confirmed the sale of the extra five bales at 63 cents per pound and requested a new "placement report" for a letter of credit.

In a letter dated February 12, 1949, from the exporter to appellee, the recent cable exchange between them was confirmed in which grey duck feathers had been ordered at 42 cents per pound and white goose feathers at 61 cents per pound to be shipped in February and March, 1949. Enclosed was a "placement report" for $2,317.50 and a request was made in the letter that upon its receipt appellee open by air mail a letter of credit for payment f. o. b. Shanghai at 31 cents per pound for the duck feathers and 48 cents per pound for the goose feathers. The following statement appears in the letter:

> No mention of consular invoice is to be made on the Letter of Credit. Same will be sent separately.

> The difference between the amount drawn through the bank and the actual amount of order will have to be paid in the States. We will advise you in due course where to pay in the difference which will amount to approximately $400.00.

Attached to that letter which appeared as an exhibit are the exporter's "Placement Report" 1617, in which the prices for the goods are shown at 42 cents and 61 cents, respectively, and another "Placement

Report" 1617–R, in which the prices are set forth at 31 cents and 48 cents per pound, respectively.

Under date of March 10, 1949, the exporter wrote to appellee advising that ten bales of Nanking white goose feathers and five bales of Nanking grey duck feathers had been shipped. Attached to that letter was a consular invoice in duplicate and the two commercial invoices heretofore mentioned, one for $3,372.33 and another in the sum of $2,794.48. The shipper notified appellee that they had drawn a sight draft under a letter of credit in the sum of $2,794.48 and stated that the balance of the purchase price $577.84 should be paid by check to the New York office of the exporter.

On March 17 appellee sent a letter to its customs broker informing it that appellee expected a shipment from Liebermann, Waelchli & Co. and assumed it would arrive sometime in April. Attached to that letter was the invoice containing the lower price of the goods and two bills of lading covering the shipment.

The goods were entered on April 7, 1949, accompanied by the commercial invoice which showed the price of the duck and goose feathers to be 31 cents and 48 cents per pound, respectively.

On April 12, 1949, the broker sent a letter to appellee in which the following was stated:

This is to remind you that we gave bond to produce Consular Invoice covering the 15 bales [of] feathers, which we have just cleared ex the OCEAN MAIL. Will you kindly let us have this as soon as received.

Under date of April 15 the New York office of the exporter sent a letter to appellee in which it was stated that their Shanghai office had advised the New York office of the shipment. That letter contained the following:

We have also been advised that we are to receive from your office an additional payment $577.85 covering the difference between the invoice price and the actual selling price.

Appellee paid the sum as requested to the New York office of the shipper.

Some time subsequent to the events hereinbefore related the customs examiner sent a note to the customs brokerage firm requesting that they furnish the appraiser with all copies of cables which were referred to in the pro forma invoice and the shipper's cables to appellee together with any other information having a bearing on the market value of Chinese feathers.

That request must have been shortly prior to May 5, 1949, which is the date of the letter from the customs broker to appellee in which appears:

On the invoice filed with this Entry, references were made to various cables and reports. The Customs Examiner has asked us to furnish him with all cables

referred to in this invoice together with any other information bearing on the market value of Chinese feathers. * * *

The letter then went on to supply the dates of the various cables and placement reports and ended up by stating:

Will you kindly let us have this information.

On May 23, 1949, the appraiser at Seattle sent a memorandum to the Supervising Customs Agent requesting that an investigation be made of the value of the feathers covered by the entry of the goods herein. It was stated in that memorandum that on April 28, 1949, the broker had been notified to obtain copies of the cables, etc., which pertained to the importation and that up to the date of the letter they had received no action on their request.

On May 31, 1949, Mr. Sidney J. Hanauer, one of the members of the importing firm, executed an Owner's Declaration, Customs Form 3347, and that said declaration according to the official receipt stamp thereon indicates that it was filed in the office of the collector on June 13, 1949.

Not until June 14, 1949, was the original consular invoice, which had been consulated at Shanghai March 9, 1949, filed in the collector's office. That invoice set out the true purchase prices of the importation at 42 cents and 61 cents per pound, respectively.

At the trial before the United States Customs Court, the principal witness appearing on behalf of appellee was its secretary and book-keeper. She testified that she had first seen the commercial invoice setting out the untrue selling price of the goods when the letter of credit which covered the merchandise was paid at the bank and the invoice had been brought back to her office. She said that the letter of credit was "picked up" on March 16, 1949, and that she received the original of it from Mr. Frederick F. Hanauer, one of the partners of appellee. She said she made entry of the matter in a little book and from that eventually would put it on the permanent records of appellee. The posting of the item she said would show that the letter of credit had been paid at the bank. The witness testified she did not know the full purchase price of the merchandise but did know that an additional payment over and above that shown in the commercial invoice had been made to the New York office of the exporting company. That statement was corroborated by means of the cancelled check which covered the payment. In other words, with respect to the payment for the importation, the bank in Seattle received $2,801.47 and the New York office of the exporter $577.85.

The witness testified that she sent the commercial invoice, setting out the untrue purchase price, to the broker and stated that at that time she had no other invoice on the same merchandise. She did not

transmit the consular invoice nor the commercial invoice setting out the true purchase price of the goods to the broker for the reason, she stated, that it was filed away in error. She thought that everything with respect to the transaction had been finished and so she "just filed it away." The witness testified that she had nothing to do with the transaction and that all matters of that kind were handled by Frederick F. Hanauer who was not present at the trial and was probably, as was said, in Germany at the time of the trial.

The witness was quite hazy as to whether or not she had been told by Frederick F. Hanauer to send instructions to the brokerage office and she did not know what instructions had been given to the broker by him. She further stated that she had not seen the paragraph in the letter of February 12, 1949, from the exporter to appellee in which it was stated that the difference between the amount drawn through the bank and that to be paid to its New York office appeared.

The witness acknowledged receipt of the letter from the broker requesting copies of all papers and the consular invoice and she said that Frederick F. Hanauer who handled that affair gave such letter to her with instructions to look up the matters requested in the letter and to mail them to the brokerage office. Then she testified, "However, he was on his way to New York at the time, and he had given me a lot of work to do. So I had laid it aside and hadn't made the copies until the Customs inspector had walked in the office, and then I realized that the consular invoice was in our office."

The witness testified that in the six years during which she had been employed with appellee that she had become familiar with the information necessary to give to customs brokers before they filed an entry, and stated that this was the first case in which there was a consular invoice missing at the bank. She stated she had never personally handled any entries with the broker prior to the instant transaction and that she would receive whatever was necessary to send the broker from Frederick F. Hanauer and forward them in accordance with his directions. The witness could not remember when Frederick F. Hanauer went to New York, even as to the month, and had no office copy of the letter which she said he dictated to her and which she had not written.

A second witness appearing on behalf of appellee was a partner in the importing company and he stated that the partners at the time of the trial consisted of Frederick F. Hanauer who was then a silent partner and Harry S. Schmidt and himself as active partners, and that at the time of the importation Frederick F. Hanauer and he were active partners. The witness stated he was familiar with the purchase made by the partnership and that he was familiar with the outline of how the imported goods were purchased and paid for. With

respect to the payment having been made in part to the New York office of the exporter, the witness stated that as far as he could recall it was due to Chinese inflation and restrictions. Taken as a whole, the witness's testimony was more or less innocuous with respect to the transaction although he admitted he had signed the owner's declaration.

The United States Customs Examiner was called by counsel for appellee. He was the examiner of the instant importation. He testified that prior to the filing of the entry with the collector the broker submitted the invoice to him with the regular form of "submit sheet." He further stated that prior to entry he had seen nothing other than the commercial invoice which was filed with the entry. He testified that the importer was requested to produce his correspondence and cables and that he had not responded to the request, and after at least two requests to the customshouse broker to obtain those papers the investigation was instituted. It appears from his testimony that up to May 23, 1949, which was the date of the beginning of the investigation, neither the broker nor the importer had furnished the customs officials with any information as to the correct purchase price of the goods.

The president of the customhouse brokerage company was called by counsel for the Government. He testified as to the signed owner's declaration and stated that the first intimation he had of any discrepancy of invoice values was when the investigator came to his office and informed him he had been to the office of appellee and found a consular invoice in the files showing a different value from the invoice which had been filed with the entry, and from then on the witness stated, he started to build up his case and to get the facts and present them to the customs officials.

On the record hereinbefore outlined, the trial court stated it to be apparent that the entry of the goods at a value less than that found on final appraisement was due to an error of an employee of the petitioner in filing the consular invoice instead of forwarding it to the customs broker. The court held that it found her account of what transpired to be logical and probable and, for the reason that in the opinion of the trial court it was mere carelessness on the part of the bookkeeper, the petition was granted.

We cannot agree with the reasoning of the trial court.

Section 489 provides in part as follows:

Tariff Act of 1930:

Sec. 489. ADDITIONAL DUTIES.

If the final appraised value of any article of imported merchandise which is subject to an ad valorem rate of duty or to a duty based upon or regulated in any manner by the value thereof shall exceed the entered value, there shall be

levied, collected, and paid, in addition to the duties imposed by law on such merchandise, an additional duty of 1 per centum of the total final appraised value thereof for each 1 per centum that such final appraised value exceeds the value declared in the entry. * * * Such additional duties * * * *shall not be remitted* nor payment thereof in any way avoided, *except* in the case of a clerical error, * * * or in any case upon the *finding of the United States Customs Court,* upon a *petition* filed * * * and *supported by satisfactory evidence* * * * that the entry of the merchandise at a less value than that returned upon final appraisement was without any *intention* to defraud the revenue of the United States or to *conceal or misrepresent the facts* of the case or to *deceive the appraiser as to the value* of the merchandise. * * * [Italics supplied.]

The only issue here is whether or not appellee produced satisfactory evidence that the entry made at less than its true value was without intention to defraud the revenue of the United States or to "conceal or misrepresent the facts of the case or to deceive the appraiser as to the value of the merchandise."

It is obvious that prior to the time of entry the importer knew the foreign price list of the shipper and the cablegrams hereinbefore noted with respect to the merchandise were in its possession. It is clear that it must have had the consular invoice which was certified in Shanghai March 9, 1949, showing the actual purchase price for the shipment and certainly it knew the true purchase price of the involved merchandise.

In our opinion it is clear from the record that no satisfactory evidence has been produced that there was no intention to conceal or misrepresent the facts in the case or to deceive the appraiser as to the value of the merchandise.

The carelessness on the part of the witness who was an employee of appellee cannot be considered by us to excuse the performance of a duty which was incumbent upon the employer.

It has been consistently held that in carrying the burden the petitioner for remission must present satisfactory evidence of good faith and a full disclosure to the appraiser at the time of entry. *Wolf* v. *United States,* 13 Ct. Cust. Appls. 589, T. D. 41453; *United States* v. *Penna. Salt Mfg. Co.,* 26 C. C. P. A. (Customs) 232, C. A. D. 22; *United States* v. *Antilla Trading Co.,* 26 C. C. P. A. (Customs) 256, C. A. D. 25; *Gresham* v. *United States,* 27 C. C. P. A. (Customs) 106, C. A. D. 70; and *United States* v. *H. S. Dorf & Co.,* 36 C. C. P. A. (Customs) 29, C. A. D. 392.

It is very clear to us from the record that appellee did not sustain its burden of proof.

For the reasons hereinbefore stated, the judgment of the United States Customs Court is *reversed.*

JACKSON, J., retired, recalled to participate herein in place of JOHNSON, J.